## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

<table>
<tr><td>

North American Company for Life
and Health Insurance,

                Plaintiff,

v.

Roberto Pouncey,

                Defendant.

</td><td>

Civil No. 3:23-cv-00137 (SVN)


September 3, 2024

</td></tr>
</table>

### REPORT AND RECOMMENDATION ON
### PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT [ECF No. 23]

**I.**    **INTRODUCTION**

This is an insurance case in which the plaintiff, North American Company for Life and Health Insurance ("North American"), seeks a declaratory judgment declaring that a term life policy obtained by the defendant, Roberto Pouncey, is void *ab initio* on account of material misrepresentations in his application. (Compl., ECF No. 1, at 6.)  Mr. Pouncey failed to appear, and North American moved for a default judgment. (Mot. for Default J., ECF No. 23.)  The presiding District Judge, the Honorable Sarala V. Nagala, referred the motion to me, Magistrate Judge Thomas O. Farrish. (Order of Referral, ECF No. 24.)  I received two additional briefs (Resp. to Show Cause Order, ECF No. 30; Suppl. Br., ECF No. 36), and I heard oral argument. (Tr. of Hrg. on Mot. for Default J., ECF No. 35.)  The motion is therefore ripe for decision.

Having carefully considered the matter, I recommend that Judge Nagala **DENY** the motion. North American's policy contains an "incontestability clause," a common life insurance policy provision that limits the time in which the company may contest the validity of the contract on account of misrepresentations in the application process. (Policy, ECF No. 1-2, § 3.3, p. 7.)  The

contestability period is two years (*id.*), and North American's own pleadings plainly demonstrate that its action is untimely.  (*See* discussion, Section III.C *infra.*)

North American says that its own contractual clause should be disregarded because incontestability is an affirmative defense that Mr. Pouncey waived when he failed to appear. (Suppl. Br., ECF No. 36, at 5.)  It is well established, however, that courts may consider unpled affirmative defenses when adjudicating motions for default judgment, if those defenses are "set forth in the papers plaintiff himself submitted."  *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) (citation omitted).  That is the case here, because the facts establishing incontestability are clearly set forth in the insurance policy and service-of-process documents that North American itself submitted.  (*See* discussion, Section III.C *infra.*)

North American argues that even if its current claims are barred by the incontestability clause, it should be given leave to amend its complaint to cure the defect.  (Suppl. Br., ECF No. 36, at 1-4.)  The operative complaint alleges only that Mr. Pouncey made simple, non-fraudulent misrepresentations in his insurance application.  (Compl., ECF No. 1, ¶ 27.)  North American contends that it can, consistent with Rule 11, amend its complaint to upgrade these allegations to fraud, and it further contends that such an allegation would fix things because "Connecticut law does not preclude a fraud exception to incontestability."  (Suppl. Br., ECF No. 36, at 1.)  But it cites no Connecticut case in which an insurer avoided the operation of its own incontestability clause in this way, and indeed the available authorities are to the contrary.  (*See* discussion, Section III.C *infra.*)  And even if Connecticut state courts were split or otherwise undecided on the issue of a fraud exception to incontestability, it would arguably be inappropriate for a federal court to decide the issue in a declaratory judgment.  (*See id.*)  Put differently, if North American amended its complaint to add fraud allegations, the amendment would either be futile, or it would raise

jurisdictional issues.  I therefore recommend that the denial of North American's motion be without leave to replead.

## II.    BACKGROUND

The following facts are taken from North American's complaint, and are deemed admitted for purposes of a default judgment motion.  (*See* discussion, Section III.C.1 *infra*.)  North American is an Iowa company that sells life insurance and other financial products.  (Compl., ECF No. 1, ¶ 2.)  "On or about" February 5, 2021, it received a life insurance application from Roberto Pouncey.  (*Id.* ¶ 8.)  In his application, Mr. Pouncey represented, among other things, that he had not used cocaine within the previous ten years.  (*Id.* ¶ 11; *see also* Application, Ex. A to Compl., ECF No. 1-1, at 3.)  He also represented that he had not "been diagnosed or treated by a medical professional for . . . [a]lcohol abuse."  (Application, ECF No. 1-1, at 4; *see also* Compl., ECF No. 1, ¶ 14.)  He affixed his electronic signature to the application (Application, ECF No. 1-1, at 11), and in so doing he declared that his "[s]tatements and answers in this application . . . are complete and true to [his] best knowledge and belief."  (*Id.* at 9.)

North American issued a life insurance policy in reliance on these representations.  (Compl., ECF No. 1, ¶ 15.)  The policy was a simple ten-year term policy that began on February 5, 2021 and expired on February 5, 2031.  (Policy, Ex. B to Compl., ECF No. 1-2, at 4.)  The death benefit was $100,000.00 (*id.*), and the beneficiary was Mr. Pouncey's former spouse.  (*Id.* at 5; *see also* Application, ECF No. 1-1, at 6.)

Importantly for this case, the policy contained an incontestability clause.  (Policy, ECF No. 1-2, at 7.)  The clause read in relevant part:

> **INCONTESTABILITY** – The Company cannot contest this Policy after it has been in effect during the lifetime of the Insured for two years from the Policy Date or, if reinstated, for two years from the date of reinstatement, except for:
>
> (a) Non-payment of Premium; or

     (b) Fraud, where permitted by applicable law in the state where this Policy is delivered or issued for delivery.

(*Id.*)  The clause also required Mr. Pouncey to cooperate with any timely contestability investigation that North American might pursue.  (*See id.*) ("As long as this Policy remains contestable, the Insured, Owner, Beneficiary, or next-of-kin will cooperate with the Company in any contestable investigation conducted by the Company, including, but not limited to, supplying the Company with necessary authorizations for medical and other information.").

     After it issued the policy, North American conducted a contestability investigation. Neither its complaint nor any of its subsequent submissions say exactly when the investigation began, but by January 5, 2023 – twenty-three months into the life of the Policy – it had concluded that Mr. Pouncey's cocaine and alcohol representations were false.  (*See* Compl., ECF No. 1, ¶ 23.)  During the investigation North American obtained records from the APT Foundation, "a non-profit treatment and recovery program for individuals who suffer with substance use disorders or mental illness." (*Id.* ¶ 18.)  Those records revealed that Mr. Pouncey had used cocaine on February 29, 2019, well within the ten-year period encompassed by the application question.  (*Id.* ¶ 19.)  The records also revealed that he had received diagnoses of substance use disorder and alcohol use disorder, and had undergone in-patient treatment.  (*Id.* ¶ 21.)

     North American says that if Mr. Pouncey had "truthfully represented his cocaine use and diagnoses and treatments for alcohol abuse, the Policy would not have been approved."  (*Id.* ¶ 22.)  It therefore sent him a letter on January 5, 2023, explaining that "it would like to rescind the Policy on the basis of a material misrepresentation," and seeking "his mutual agreement to do so."  (*Id.* ¶ 23.)  Mr. Pouncey did not respond.  (*Id.* ¶ 24.)

     North American then filed a complaint in this Court on February 2, 2023, seeking to void or rescind the policy by way of a declaratory judgment.  (*Id.*)  After a brief introductory statement,

the complaint alleged that diversity jurisdiction exists under 28 U.S.C. § 1332 because North American is "incorporated and existing under the laws of the State of Iowa with its principal place of business is in Iowa," and because Mr. Pouncey "resid[es], upon information and belief, in Wethersfield, Connecticut." (*Id.* ¶¶ 2, 3, 6.) The complaint then recounted the above facts about the insurance application, and it alleged that because Mr. Pouncey had made material misrepresentations, the company was "entitled to a judicial declaration that, pursuant to Connecticut law, the Policy is void *ab initio*." (*Id.* ¶ 31.) In its prayer for relief, it asked the Court to declare "[w]hether the Policy is void *ab initio*, or in the alternative, whether North American may rescind the Policy." (*Id.* at p. 6.) The company also requested an award of attorney's fees and costs, and "such further relief as this Court deems appropriate." (*Id.*)

North American struggled to serve the complaint on Mr. Pouncey. On February 13, 2023 its process server went to the Wethersfield apartment that he had lived in when he applied for the policy, only to find the unit occupied by new tenants. (Aff. of Non-Service, ECF No. 10-2, at 2.) A different process server went to Mr. Pouncey's mother's home in West Haven on March 15, 2023, but his mother said she had not spoken with him in years and did not know if he still lived in Connecticut. (ECF No. 10-3, at 2.) North American then hired a private investigator, who "ran a database report" and determined that Mr. Pouncey's "last known address" was "421 Tolland Street, Unit 216, East Hartford, CT[.]" (ECF No. 12, ¶ 6.) The second process server attempted service at that address on March 20, 2023, but was unable to get past the building lobby. (ECF No. 10-4, at 2.) The server left a note in the mailbox for Unit 216, which had the name "Pouncey" on it. (*Id.*; *see also* ECF No. 12-1, at 8.) Two days later, the process server received a phone call from someone identifying herself as Kandi Jackson. (ECF No. 10-4, at 2.) Ms. Jackson "stated she had recently moved into [the] unit," and that Mr. Pouncey was "not known to her." (*Id.*) North

American noted, however, that the number from which "Ms. Jackson" called was "known to be associated with Defendant Pouncey's former spouse and her business." (ECF No. 10, ¶ 5.) For this reason and others, the company began to suspect that Mr. Pouncey was "purposefully evading service." (*Id.*.)

North American asked its process server to return to the East Hartford apartment in June, 2023. (*See* ECF No. 12-1.) The server unsuccessfully attempted in-person service on June 28 and June 29. (*Id.*) She returned yet again on six occasions in July, and was equally unsuccessful each time. (ECF No. 15-1.) On each such occasion, she checked the building's parking lots and did not observe Mr. Pouncey's car. (*Id.*) North American then asked the Court to authorize abode service (ECF No. 15), and the Court granted its request. (ECF No. 16.)

North American's process server returned to 421 Tolland St. on September 1, 2023, "but was unable to personally locate" Mr. Pouncey. (ECF No. 18.) He therefore left copies of the summons, complaint, and related documents under the door of Apartment 216. (*See id.*) He also delivered copies of the documents to the Connecticut Secretary of the State, and he sent them to Mr. Pouncey by certified mail as well (*id.*), although the Post Office returned the certified mail copies to the process server as "unclaimed/unable to forward." (ECF No. 20.) North American filed the server's affidavit on September 8, 2023. (ECF No. 18.)

Mr. Pouncey failed to appear, and North American therefore moved for entry of a default on October 12, 2023. (ECF No. 21.) The Clerk of the Court entered a default on October 17, 2023. (ECF No. 22.) North American then moved for a default judgment. (ECF No. 23.) The company asserted that, "[h]aving complied with the requirements of Rule 55," it was "entitled to a judicial declaration that, pursuant to Connecticut law, the Policy is void *ab initio*, as it was issued by North American in reliance upon material misrepresentations made by Mr. Pouncey, or, in the

alternative, that the misrepresentations constitute grounds for rescission of the Policy by North American." (*Id.* ¶ 11.)  Judge Nagala referred the default judgment motion to me.  (ECF No. 24.)

Upon reviewing the complaint and the policy that North American had attached to it, I observed that the policy might have gone incontestable.  Specifically, I noted that "[t]he policy states that North American 'cannot contest this Policy after is has been in effect during the lifetime of the Insured for two years from the Policy Date . . . except for . . . Non-payment of Premium; or . . . Fraud, when permitted by applicable law in the state where this Policy is delivered or issued for delivery." (Order to Show Cause, ECF No. 25.)  Further noting that "[a]t least one Connecticut court has held that a 'contest' within the purview of such policy means a present suit in court," and that "in Connecticut, an action is commenced on the date of service of the writ upon the defendant," I queried whether the policy had gone incontestable because "the two-year anniversary of the Policy Date was February 5, 2023 . . . yet the complaint was not served until September 1, 2023 . . . assuming that abode service was proper and properly effectuated in this instance."  (*Id.*)  I acknowledged "that incontestability is often presented as an affirmative defense," and that "affirmative defenses are often deemed waived by the defendant's default," but I added that "[h]ere, an incontestability defense would seem to be suggested by the papers that the plaintiff itself submitted."  (*Id.*)  I therefore directed North American "to file a supplemental brief showing why the motion for default judgment should not be denied on account of the incontestability provision."  (*Id.*)

After seeking and obtaining two extensions of time, North American submitted a two-and-a-half page brief.  (Response to Court's Order to Show Cause, ECF No. 30.)  The company asserted that it had done "what it was supposed to do every step of the way by trying to resolve this matter without court intervention amicably" – an evident reference to the January 5, 2023 letter – but was

stymied by Mr. Pouncey's "active[] avoid[ance]." (*Id.* at 1.)  North American acknowledged that the Court had the power to consider contestability, even though Mr. Pouncey had not appeared and raised it himself, but it urged the Court not to do so.  Noting that ours "is an adversarial system, not an inquisitorial one," it exhorted the Court not to "decide this issue *sua sponte*" because doing so would "permit insureds to merely ignore requests to rescind policies and use avoidance of service of process to benefit themselves." (*Id.*. at 2.)  In North American's view, Mr. Pouncey made an affirmative decision not to appear, "and this Court should, respectfully, enter a judgment in accordance with his decision not to be involved or actively dispute North American's requested relief." (*Id.*)  Finally, North American argued that "[a]t a minimum," it "should be permitted leave to amend its complaint to include a fraud cause of action, which would cure" any incontestability problem. (*Id.* at 3.)

I then held a hearing on North American's motion.  (Tr. of Hrg. on Mot. for Default J., ECF No. 35.)  The company again acknowledged that the Court "obviously has the right to consider" the incontestability issue, but it urged the Court not to exercise this power in favor of a defendant who had "actively avoided process." (*Id.* at 4:17-23.)  It also argued that it could fix any contestability problems with an amended complaint alleging fraud, but it was unable to cite any authority for the proposition that Connecticut law permits fraud contests after the contestability period expires. (*Id.* at 9:7 – 10:5.)  I asked North American whether it wished to submit yet another brief to address this issue and to provide whatever authority may exist, and I reminded its counsel that a party ordinarily cannot raise new arguments in an objection to a Magistrate Judge's recommended ruling. (*Id.* at 10:6-11:5); *see also Pilgian v. Icahn Sch. of Med. at Mt. Sinai*, 490 F. Supp. 3d 707, 715-16 (S.D.N.Y. 2020) ("[N]ew arguments and factual assertions cannot properly be raised for the first time in objections to [a Magistrate Judge's] report and

recommendation, and indeed they may not be deemed objections at all.").  North American accepted the invitation and submitted another short brief – its third – addressing this issue and others that had been left unresolved at the hearing.  (Suppl. Br., ECF No. 36.)  The motion is therefore fully briefed and argued, and it is ready for resolution.

## III.    DISCUSSION

### A.    Subject Matter Jurisdiction

Before addressing the merits of North American's motion, the Court must first satisfy itself that it has jurisdiction over the case.  North American did not address jurisdiction in any of its three submissions, but the Court is obliged to do so.  As the Second Circuit has explained, even when the defendant does not contest the issue, courts "have an independent obligation to determine whether federal jurisdiction exists[.]"  *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt.*, 692 F.3d 42, 48 (2d Cir. 2012).  "This rule flows from the principle that a failure of subject matter jurisdiction is not waivable . . . and from the principle that a party seeking to invoke the subject matter jurisdiction of a Court has the burden of demonstrating that there is subject matter jurisdiction in the case."  *Mumma v. Pathway Vet Alliance, LLC*, 648 F. Supp. 3d 373, 386 (D. Conn. 2023) (brackets, quotation marks, and citations omitted).

Two statutes invest federal courts with jurisdiction.  "28 U.S.C. § 1331 . . . addresses federal question jurisdiction, and 28 U.S.C. § 1332 . . . addresses diversity jurisdiction."  *Ohio Sec. Ins. Co. v. Veteran Constr. Servs.*, No. 3:23-cv-257 (SVN), 2024 WL 1287583, at *4 (D. Conn. Mar. 26, 2024)*.*  North American does not contend that this case implicates the Court's federal question jurisdiction, even though it has sued under the federal Declaratory Judgment Act ("DJA") (*see* Compl., ECF No. 1, ¶¶ 1, 4), presumably in recognition of the rule that the "Act . . . alone does not provide a court with jurisdiction."  *California v. Texas*, 593 U.S. 659, 672 (2021); *see also*

*Smulley v. Safeco Ins. Co. of Ill.*, No. 3:20-cv-1888 (JAM), 2021 WL 3374741, at *5 (D. Conn. Aug. 3, 2021) ("[B]ecause the [DJA] expressly conditions its application on there being an actual controversy within a federal court's jurisdiction, it is well established that a complaint's invocation of the [DJA] is not enough by itself to sustain federal question jurisdiction."), *aff'd*, No. 21-2124-cv, 2022 WL 16753118 (2d Cir. Nov. 8, 2022).  Instead, North American seeks to invoke the Court's diversity jurisdiction.  (Compl., ECF No. 1, ¶ 4.)

### 1.    *Diversity jurisdiction*

Under 28 U.S.C. § 1332, diversity jurisdiction does not exist unless two principal requirements have been met.  The first is that the "matter in controversy" must exceed "the sum or value of $75,000, exclusive of interest and costs[.]"  28 U.S.C. § 1332(a).  In the context of this case, the second is that the dispute must be "between . . . citizens of different States[.]"  *Id.*  The party seeking to invoke diversity jurisdiction bears the burden to show that both requirements have been satisfied.  *See Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 160 (2d Cir. 1998) ("The party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete."); *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) ("A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." (citation and quotation marks omitted)).

In declaratory judgment actions, the amount-in-controversy requirement is met if "the value of the object of the litigation" exceeds $75,000.  *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *4 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)).  When the action seeks a declaration about an insurance policy, courts employ two different methods for measuring that value, depending on the type of declaration sought.  If the plaintiff seeks a declaration about

"the applicability of an insurance policy to a particular occurrence, the jurisdictional amount in controversy is measured by the value of the underlying claim – not the face amount of the policy." *Amica Mut. Ins. Co. v. Levine*, 7 F. Supp. 3d 182, 187 (D. Conn. 2014) (quoting *Hartford Ins. Group v. Lou–Con, Inc*., 293 F.3d 908, 911 (5th Cir.2002)) (collecting cases).  But if the "substance of the declaratory judgment action seeks to determine the validity of an insurance policy, then the policy limit is the amount in controversy."  *Id.* (quoting *Infinity Ins. Co. v. Guerrero*, No. CIV F 07-583 (AWI) (TAG), 2007 WL 2288324, at *3 (E.D. Cal. Aug. 8, 2007)); *see also Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801, 805 (7th Cir. 2003) ("[W]hen the validity of a policy (as opposed to the insurer's obligation to pay) is in dispute, the face value of that policy is the proper measure of the amount-in-controversy.").

In this case, the amount-in-controversy requirement is satisfied.  North American seeks an order declaring the policy void *ab initio* (Compl., ECF No. 1, p. 6), and accordingly the policy limit determines the amount in controversy for purposes of 28 U.S.C. § 1332.  *See Amica Mut. Ins. Co.*, 7 F. Supp. 3d at 187.  The company states that its policy limit is $100,000 (Compl., ECF No. 1, ¶ 5), and the copy of the policy that it has placed into the record confirms this.  (Policy, ECF No. 1-2, at p. 4) (reflecting face amount of $100,000).  Because the policy limit exceeds $75,000, Section 1332's amount-in-controversy requirement is met.  *Guardian Life Ins. Co. of Am. v. Muniz*, 101 F.3d 93, 94 (11th Cir. 1996) (holding that the amount-in-controversy requirement had been met in a declaratory judgment action seeking the cancelation of a $100,000 life insurance policy).

The diversity-of-citizenship requirement is satisfied when the plaintiff and the defendant are "citizens of different States[.]"  28 U.S.C. § 1332(a).  For purposes of this requirement, a corporation is "deemed to be a citizen of any State by which it has been incorporated and of the State . . . where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  The corporation's

"principal place of business" is "the place where the corporation's high level officers direct, control, and coordinate [its] activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010). A natural person, by contrast, "is deemed a citizen of the state wherein he or she is domiciled." *Universal Reins. Co. v. St. Paul Fire & Mar. Ins. Co.*, 224 F.3d 139, 141 (2d Cir. 2000) (citing *Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1998)).

A person's state of domicile is not necessarily his state of residence. "Domicile has been described as the place where a person has 'his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'" *Linardos*, 157 F.3d at 948 (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3612, at 526 (2d ed. 1984)). Conversely, "a person may have a residence in a place in which he or she intends to live only temporarily." *Gross v. Rell*, 485 F. Supp. 2d 72, 77 (D. Conn. 2007). Of course, a person's domicile and his residence "typically coincide." *Windward Bora LLC v. Browne*, 110 F.4th 120, 124 n.5 (2d Cir. 2024) (quoting 13E C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3612, at 527 (3d ed. 2009)). Nevertheless, "[d]omicile and residence are not synonymous," *id.*, and "a party can reside in one place and be domiciled in another." *Kennedy v. Trs. of Testamentary Tr. of Will of Kennedy*, 633 F. Supp. 2d 77, 81 (S.D.N.Y. 2009) (citing *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47-49 (1989)), *aff'd,* 406 F. App'x 507 (2d Cir. 2010).

In determining whether the diversity-of-citizenship requirement is satisfied, the domicile that counts is the one that the party had at the time the plaintiff initiated the lawsuit. "It is hornbook law that the question of '[w]hether federal diversity jurisdiction exists is determined by examining the citizenship of the parties at the time the action is commenced.'" *Linardos*, 157 F.3d at 948 (alteration in original) (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice &

Procedure § 3608, at 448-49 (2d ed. 1984)).  It therefore follows that, "[f]or purposes of diversity jurisdiction, the relevant domicile is the parties' domicile at the time the complaint was filed."  "*Van Buskirk v. United Grp. of Cos.*, 935 F.3d 49, 53 (2d Cir. 2019).

When a complaint contains allegations of residence and not domicile, courts in the Second Circuit typically have not ignored the omission, even though the two concepts often overlap.  In *Century Metal Recycling, Pvt. Ltd. v. Dacon Logistics, LLC*, for example, the plaintiff alleged "upon information and belief" that a natural person defendant lived in New Jersey, and "conclusively state[d]" that the defendant was therefore a citizen of New Jersey.  No. 3:13-cv-93 (CSH), 2013 WL 5929816, at *2 (D. Conn. Nov. 4, 2013).  In considering whether he had jurisdiction to rule upon a subsequent motion for default judgment, Judge Haight analyzed the "differences between a domicile and a residence" and observed that "[t]he test for an individual's residency is . . . significantly less stringent than the 'more rigorous domicile test.'"  *Id.* at *3 (quoting *Martinez v. Bynum*, 461 U.S. 321, 331 (1983)).  He noted that "'a statement of residence, unlike domicile, tells the court only where the parties are *living* and not of which state they are *citizens.*'"  *Id.* at *2 (quoting *John Birch Soc'y v. Nat'l Broad. Co.*, 377 F.2d 194, 199 (2d Cir. 1967)).  "[A] court may not and cannot simply infer the latter from the former."  *Id.* at *3 (citing *Realty Holding Co. v. Donaldson*, 268 U.S. 398, 399 (1925)).  "Thus it is 'well-established that allegations of residency alone cannot establish citizenship.'"  *Id.* at *2 (quoting *Canedy v. Liberty Mut. Ins. Co.*, 126 F.3d 100, 102-03 (2d Cir. 1997)).  Because the plaintiff had alleged only residency, not domicile, it had not alleged facts sufficient to establish diversity jurisdiction.  *Id.* at *3; *see also MBC Ventures, LLC v. Miniventures of NY, Inc.*, No. 3:20-cv-762 (CSH), 2021 WL 3709808, at *6-7 (D. Conn. Aug. 20, 2021) ("Because Plaintiff has simply alleged that Defendant . . . resides in Norwalk, Connecticut, it has failed to establish her citizenship."); *S Rock Partners, LLC v. Kiselev*, No. 3:17-

cv-1670 (CSH), 2018 WL 888725, at *5 (D. Conn. Feb. 14, 2018) ("Plaintiff has failed to establish the citizenship of [Defendant].  Plaintiff merely states his residence, as opposed to domicile, before November of 2015 – approximately two years before Plaintiff commenced this action . . . ."); *Zeevi v. Konfino*, No. 3:12-cv-1125 (CSH), 2012 WL 6026219, at *3 (D. Conn. Dec. 4, 2012) ("While Plaintiff has in her Complaint alleged *residency* of herself and Defendant, she has not established either party's *citizenship.*").

In this case, North American has not alleged facts sufficient to satisfy the diversity-of-citizenship requirement.  While it adequately pled its own citizenship (*see* Compl., ECF No. 1, ¶ 2) (stating that North American "is a life insurance company incorporated and existing under the laws of the State of Iowa with its principal place of business in Iowa"), with respect to Mr. Pouncey it alleges only that he "is a natural person, *residing*, upon information and belief, in Wethersfield, Connecticut."  (*Id.* ¶ 3) (emphasis added).  This is an allegation of residency and not domicile. Moreover, even the residency allegation appears to be conclusory; North American's complaint supplies no fact-based reason to suppose that Mr. Pouncey lived in Wethersfield at the time it was filed, and indeed when North American tried to serve him at the Wethersfield condominium where he lived when he purchased the policy in 2021, the unit was occupied by new tenants.  (Aff. of Non-Service, ECF No. 10-2; *see also* discussion, Section III.B *infra.*.)  Later in its complaint, North American does allege that "Mr. Pouncey is a citizen of the state of Connecticut" (Compl., ECF No. 1 ¶ 6), but courts have disregarded this sort of conclusory claim when the only supporting allegations are allegations of residency – even in default scenarios where the defendant is deemed to have admitted the plaintiff's well-pleaded factual allegations.  *E.g., Century Metal Recycling*, 2013 WL 5929816, at *2 (disregarding, for jurisdictional purposes, the plaintiff's "conclusive[]" statement that the defendant was a citizen of New Jersey).

When plaintiffs neglect to plead domicile, courts do not ordinarily deny their default judgment motions for that reason alone. Instead, they typically give the plaintiff leave to cure the defect, either through a pleading amendment or through affidavits confirming the citizenship of all parties. *E.g., IndyMac Venture, LLC v. Mulligan*, No. CV 15-7057 (ADS) (GRB), 2019 WL 4648419, at *5 (E.D.N.Y. Aug. 30, 2019) ("Because the failure to properly allege the predicate facts to establish subject matter jurisdiction may be cured, if appropriate, by an amendment[,]" the Magistrate Judge "recommend[ed] that plaintiff be given leave to amend . . . to cure the jurisdictional deficiencies."), *report and recommendation adopted*, 2019 WL 4647222 (E.D.N.Y. Sept. 24, 2019); *Century Metal Recycling*, 2013 WL 5929816, at *4 (refraining from denying the plaintiff's motion for default judgment, but ordering the plaintiff "to establish, by affidavit, both its own citizenship and the citizenship of both Defendants"). If the other defects in North American's default judgment motion were curable, I would recommend that Judge Nagala allow it an opportunity to demonstrate Mr. Pouncey's domicile. As will be shown below, however, those other defects are not curable.

## 2. *Additional jurisdictional principles applicable to declaratory judgments*

In addition to satisfying one of the statutory grants of jurisdiction, a federal lawsuit must also satisfy the "case or controversy" requirement of Article III of the Constitution. *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *5. "In order to qualify as a justiciable 'case or controversy' under Article III, '[t]he controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.'" *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011), *aff'd*, 568 U.S. 85 (2013) (alteration in original) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). This rule follows from the principle that federal courts are not empowered to "decide abstract questions," *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 586 (1972), and from the principle that they may not "give opinion[s] advising what the law would be upon a hypothetical

state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alteration in original) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)) (internal quotation marks omitted).

North American brings this case under the DJA, which provides that a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Though the DJA allows parties to seek declaratory relief before a case has "reached the stage at which either party may seek a coercive remedy," actions brought under the DJA must still satisfy the "case or controversy" requirement. *Admiral Ins. Corp. v. Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023) (quoting *United States v. Doherty*, 786 F.2d 491, 498 (2d Cir. 1986)) (internal quotation marks omitted). Thus, while the Act permits parties to seek declaratory relief before their dispute ripens into a damages or contract breach claim, it does not empower federal courts to issue declarations about disputes that are not yet actual controversies. *See Nike, Inc.*, 663 F.3d at 95 ("The Declaratory Judgment Act does not expand the subject matter jurisdiction of the federal courts."). In distinguishing justiciable, actual controversies from non-justiciable, abstract questions, "the critical question is whether there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Admiral Ins. Corp.*, 57 F.4th at 92 (citation, quotation marks, and ellipses omitted). Stated differently, an "'actual controversy' within the meaning of the [Act]" is "'a real and substantial controversy admitting of specific relief through a decree of a conclusive character.'" *Id.* (quoting *Aetna Life Ins. Co.*, 300 U.S. at 239, 241).

Because insurance protects against events that have yet to happen, "[j]usticiability concerns often arise in insurance declaratory judgments." *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *5. "Indeed, litigation over insurance coverage has become the paradigm for asserting jurisdiction

despite 'future contingencies that will determine whether a controversy ever actually becomes real.'" *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) (citation omitted). In these cases, the fact "[t]hat liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action." *Id.* The key question is whether there is "a practical likelihood that the contingencies will occur." *Id.*

In the Second Circuit, insurance rescission suits are typically held to be "justiciable even absent a pending claim." *United States Underwriters Ins. Co. v. Orion Plumbing & Heating Corp.*, 765 F. App'x 534, 537 (2d Cir. 2019) (summary order). In *United States Underwriters*, for example, the Second Circuit held that a liability insurer's rescission claim was justiciable even though the underlying tort claim against its policyholder had been dismissed, because there was a "reasonable likelihood that it will face liability to [the policyholder] based, at minimum, on its duty to defend [the policyholder] under its policy." 765 F. App'x at 537. In *Principal Life Ins. Co. v. Brand,* the Second Circuit held that a disability insurer's rescission suit was justiciable even though the insured's disability claim had been properly denied, because the insured might "submit additional claims" in the future. No. 21-2716, 2023 WL 8270721, at *5 (2d Cir. Nov. 30, 2023) (summary order). And in *Penn Mutual Life Insurance Co. v. Wolk*, Judge Scheindlin held with little discussion that a life insurer's rescission claim presented an actual controversy even though the insured had not yet died. 739 F. Supp. 2d 387, 394 (S.D.N.Y. 2010).

This case raises justiciability concerns, even considering these Second Circuit precedents. Mr. Pouncey is only fifty-seven years old (Application, ECF No. 1-1, at 2), and the policy will expire when he is sixty-four. (Policy, ECF No. 1-2, at 4) (noting expiry date of Feb. 5, 2031). It is a simple term life policy rather than a universal or variable life policy, and accordingly there is no possibility of future disputes over cost of insurance calculations, flexible premium calculations,

and so forth.  (*Id.*)  North American is a stock company rather than a mutual company, and the policy is a "non-participating" policy (*id.* at § 3.6, p. 7), so there is no possibility of future fights over dividends and the like.  In other words, the only contingency that could lead to a future dispute is the death of a fifty-seven year old man by age sixty-four, and North American's pleadings provide little reason to suppose that there is a "practical likelihood" of this.  The company does not say that Mr. Pouncey is in ill health, and indeed it affirmatively suggests that he conquered his substance use issues.  (Compl., ECF No. 1, ¶ 21) (stating that Mr. Pouncey "successfully complet[ed] treatment").

Nevertheless, North American has raised a justiciable claim.  As will be discussed below, Connecticut law requires life insurers to initiate rescission suits within the policy's contestability period.  (*See* discussion, Section III.C.4 *infra*); *PHL Variable Life Ins. Co. v. Charter Oak Trust*, No. HHD-cv-10-6012621-S, 2012 WL 2044416, at *3 (Conn. Super. Ct. May 4, 2012) (holding that "a 'contest' within the purview of such policy provisions means a present suit in court" (citation omitted)); *see also New York Life Ins. Co. v. Rigas*, 117 Conn. 437, 444 (1933) (holding, although under New York law, that an insurer wishing to rescind "must proceed within the time limited" by the incontestability clause, "either by way of defense to an action on the policy, or by an affirmative suit to cancel it").  This rule creates the "immediacy and reality" sufficient "to warrant the issuance of a declaratory judgment."  *Admiral Ins. Corp.*, 57 F.4th at 92 (alteration and citation omitted).  To hold otherwise would be to say that an insurer must file a non-justiciable suit to protect its rights.

### 3.    The Court's discretion to decline to exercise jurisdiction over a declaratory judgment action

To say that a plaintiff has raised a justiciable claim for declaratory judgment is not, however, to say that the Court must hear the case.  The DJA provides that, "[i]n a case of actual

controversy within its jurisdiction . . . any court of the United States . . . *may* declare the rights and other legal relations of any interested party[.]"  28 U.S.C. § 2201(a) (emphasis added).  In using "may" rather than "must," Congress gave "a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory judgment action that they would otherwise be empowered to hear."  *Admiral Ins. Corp.*, 57 F.4th at 96 (quoting *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003)).

The Second Circuit has identified six factors that "should inform a district court's exercise of such discretion[.]" *Id.* at 99.  First, the court should consider "'whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved[.]'" *Id.* (quoting *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 105 (2d Cir. 2012) (brackets omitted).  Second, it should analyze "'whether such a judgment would finalize the controversy and offer relief from uncertainty[.]'" *Id.* at 100 (quoting *Niagara Mohawk*, 673 F.3d at 105) (brackets omitted).  Third, it should consider "'whether the proposed remedy is being used merely for procedural fencing or a race to res judicata[.]'" *Id.* (quoting *Niagara Mohawk*, 673 F.3d at 105).  Fourth, the court should consider "'whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court[.]'" *Id.* (quoting *Niagara Mohawk*, 673 F.3d at 105).  Fifth, the court should ask itself "'whether there is a better or more effective remedy[.]'" *Id.* (quoting *Niagara Mohawk*, 673 F.3d at 105).  And sixth, the court should consider "whether concerns for 'judicial efficiency' and 'judicial economy' favor declining to exercise jurisdiction." *Id.* (quoting *Reifer v. Westport Ins. Co.*, 751 F.3d 129, 141, 149 (3d Cir. 2014)).  "[N]o one factor is sufficient, by itself, to mandate that a district court exercise – or decline to exercise – its jurisdiction to issue a declaratory judgment." *Id.*  Moreover, the six factors are non-exclusive, and district courts "retain[] wide

latitude to address other factors as relevant to the ultimate question of whether 'the normal principle that federal courts should adjudicate claims [over which they have] jurisdiction' should 'yield[] to considerations of practicality and wise judicial administration' in a particular case . . . ." *Id.* (second and third alterations in original) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)).

In this case, the first *Admiral Insurance* factor present a close call.  When Judge Nagala applied that factor in *Ohio Security Insurance Co.,* she considered whether the insured was actively "attempt[ing] to exercise its purported rights" under the policy, and she concluded that a declaratory judgment would "not serve a useful purpose" because the insured had "taken no actions to seek coverage from Ohio."  2024 WL 1287583, at *7.  But this factor merits a different analysis in a life insurance case, because whereas no third party's interests were affected by the question of whether Ohio Security defended an insured who had made no claim for defense coverage, here there is a beneficiary to consider.  Even though, so far as the record discloses, neither Mr. Pouncey nor his beneficiary are seeking anything from North American, a declaratory judgment will serve the useful purpose of clarifying whether the beneficiary can continue to count on the policy in her own financial planning.  *See Penn Mut. Life Ins. Co.*, 739 F. Supp. 2d at 394 (holding, in a case in which the insured had not yet died and the beneficiary had made no claim, that a declaratory judgment "would serve a useful purpose in clarifying or settling whether the Policy is valid").

The second factor – finality and "relief from uncertainty" – does not weigh in favor of exercising jurisdiction in this case.  In *Ohio Security*, Judge Nagala held that this factor only weakly supported jurisdiction when there was "no *active* controversy" between the insured and the insurer.  2024 WL 1287583, at *7.  That is true here as well, and moreover there is an additional, complicating factor.  As will be explained in Section III.B below, it is unclear whether Mr. Pouncey was validly served with process, and by extension it is unclear whether granting North American's

motion will "finalize the controversy and offer relief from uncertainty" – or whether instead it will be a mere prelude to future disputes over service.   By contrast, the third factor weighs in favor of exercising jurisdiction.  North American cannot fairly be accused of "procedural fencing" when cases like *Rigas* and *PHL Variable Life Insurance Co.* constrain it to raise its challenge before the expiration of the contestability period.

The fourth factor weighs in favor of exercising jurisdiction over North American's case as it is currently pled.  Federal courts do not usually observe "friction between sovereign legal systems" or improper "encroach[ment] on the domain of a state court" when declaratory judgment plaintiffs ask them to decide cases that raise only quotidian state law issues, particularly where there are no parallel proceedings underway in the state court.  *E.g., Cont'l Cas. Co. v. Phoenix Life Ins. Co.*, No. 3:19-cv-1448 (JAM), 2020 WL 4586699, at *4 (D. Conn. Aug. 10, 2020) (exercising jurisdiction in part because "this case does not involve novel or complex state law issues that are better left to the state courts to decide; instead, this case centers on a question of contract interpretation that is well within the competency of this Court" (quotation marks and citation omitted)); *Precision Imaging of New York, P.C. v. Allstate Ins. Co.*, 263 F. Supp. 3d 471, 475 (S.D.N.Y. 2017) ("The very existence of diversity jurisdiction severely undermines any argument that federal courts should decline to hear declaratory judgment claims between diverse parties merely because state-law questions are in issue . . . .").  While this factor can apply differently when the case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case[,]" *Tilley v. Anixter, Inc.*, 283 F. Supp. 2d 729, 738 (D. Conn. 2003), there are no such questions in this case as it is currently pled.  Under the operative complaint, this case presents relatively simple issues of misrepresentation, rescission and incontestability that are well within the competency of this Court.

The fifth factor weighs in favor of exercising jurisdiction.  Because no beneficiary has presented a claim and had it dishonored, there is no "better or more effective remedy" available in the form of a contract breach suit.  *Cf. Allstate Ins. Co. v. Essiam*, No. 3:15-cv-180 (JCH), 2015 WL 3796243, at *2, 5 (D. Conn. June 17, 2015) (noting that the fifth factor requires not only an alternative remedy, but "a *better* alternative remedy").  The sixth factor weighs in favor of jurisdiction because declaratory judgments are customarily recognized as an efficient and economical way of resolving insurance coverage issues, although the weight is lighter in this case because of the lingering questions over the propriety of service.  (*See* discussion, Section III.B *infra*.)

Having assessed all the relevant factors, I would exercise jurisdiction over this case as it is currently pled.  My assessment of the balance of factors would change, however, if North American injected "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case" by way of a pleading amendment.  I will return to this issue in Section III.C below.

## B.  Personal Jurisdiction and Service of Process

In deciding whether to grant a motion for default judgment, a district court may consider whether it has personal jurisdiction over the non-appearing defendant.  Of course, "personal jurisdiction can be waived by a party," and district courts should therefore "*not* raise personal jurisdiction *sua sponte* when a defendant has appeared and consented, voluntarily or not, to the jurisdiction of the court."  *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010) (citations omitted).  "But when a defendant declines to appear . . . before a court grants a motion for default judgment, it may first assure itself that it has personal jurisdiction over the defendant."  *Id.* (citations omitted).  As the use of the word "may" suggests, such a review is

permitted but not required.  "Whereas on default judgment a district court must assure itself of subject matter jurisdiction, it may but is not required to do so with respect to personal jurisdiction." *Harleysville Ins. Co. v. Certified Testing Labs., Inc.*, 681 F. Supp. 3d 155, 164 n.3 (S.D.N.Y. 2023) (citing *Sinoying Logistics*, 619 F.3d at 213 n.7); *see also Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *4 n.2 (quoting *Sinoying Logistics* for the proposition that a district court "*may* raise personal jurisdiction *sua sponte* when a defendant has failed to appear," but declining to do so because the pleadings raised "no reason to doubt . . . personal jurisdiction").

"To exercise personal jurisdiction lawfully, three requirements must be met." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016)."  "First, the plaintiff's service of process upon the defendant must have been procedurally proper." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) (citations omitted).  "Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective." *Id.* "Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *Id.* at 60.

With respect to the first requirement, "Rule 4(e) of the Federal Rules of Civil Procedure allows a plaintiff to serve an individual defendant who is within the United States in several ways." *Suleymanov v. Winston Premier Logistics, LLC*, No. 3:21-cv-810 (JAM), 2023 WL 5767674, at *4 (D. Conn. Sept. 7, 2023).  "First, a plaintiff may validly serve process on a defendant in accordance with either the state law of the forum (here, Connecticut) or with the law of the State where service is to be made . . . ." *Id.* (citing Fed. R. Civ. P. 4(e)(1)).  Under Connecticut law, individual defendants may be served with process "by leaving a true and attested copy of it, including the declaration or complaint, with the defendant, or at his usual place of abode, in this state."  Conn. Gen. Stat. § 52-57(a); *see also Fine Homebuilders, Inc. v. Perrone*, 98 Conn. App.

23

852, 855-56 (2006).  Second, Rule 4(e) permits service of process by "(A) delivering a copy of the summons and of the complaint to the individual personally; (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process."  Fed. R. Civ. P. 4(e)(2); *see also Suleymanov*, 2023 WL 5767674 at *4.  "[I]t is ultimately the plaintiff's burden to demonstrate that a defendant has been properly served."  *Id.* at *3.

In this case, there are reasons to question whether Mr. Pouncey was validly served.  North American unsuccessfully tried to serve him in-person for over six months.  (*See* ECF Nos. 10-2, 10-3, 10-4, 12-1, 15-1.)  In September 2023, it gave up and attempted abode service instead, slipping a copy of the summons and complaint under the door of what it understood to be his "last known address."  (ECF No. 12-1, ¶ 6; *see also* ECF No. 18, at 1 (marshal's affidavit stating that he "left a verified true and attested copy" of the summons and complaint "at the usual place of abode of . . . ROBERTO POUNCEY, at 421 Tolland Street, Unit 216, in the Town of East Hartford").)  But when North American attempted in-person service at that address four months before, Kandi Jackson responded and told the process server that she had "recently moved into the unit," and that Mr. Pouncey "was not known to her."  (ECF No. 10-4, at 2.)  The process server returned to the address on three separate dates in June, and did not find Mr. Pouncey there on any of the three occasions.  (ECF No. 12-1.)  She went back on five different dates in July, and neither Mr. Pouncey nor his car was there on any of the five.  (ECF No. 15-1.)  In short, the record supplies

plenty of reasons to suppose that, by September 2023, Mr. Pouncey no longer lived at the address at which North American attempted abode service – if indeed he ever did.[1]

Of course, "[a]n affidavit of service constitutes prima facie evidence of effective service." *Reynolds Corp. v. Nat'l Operator Servs., Inc.*, 208 F.R.D. 50, 52 (W.D.N.Y. 2002) (citation omitted). Once the plaintiff files such an affidavit, it is ordinarily up to the defendant to appear and challenge service, even if it ultimately remains the plaintiff's burden to show that service was proper. *Id.* I therefore do not recommend denying North American's default judgment motion on the ground that service was not properly effected. But in applying the *Admiral Insurance* factors for deciding whether to exercise jurisdiction over a declaratory judgment case, the likelihood of a future fight over service is relevant to the second and sixth. Because questions persist on the issue of whether Mr. Pouncey was validly served, the declaratory judgment that North American seeks is less likely to provide "finality" and "relief from uncertainty," or to be efficient and economical.

## C.      North American's Motion for Default Judgment

Having addressed jurisdiction, I will now turn to the merits of North American's motion for default judgment. I will begin by setting forth the legal principles applicable to such motions, followed by the relevant choice-of-law principles. I will then discuss the Connecticut law of

---

[1]      North American also "served" Mr. Pouncey by certified mail, and by delivering copies of the summons and complaint on the Connecticut Secretary of the State. (ECF No. 18-1.) But neither method is an acceptable way of serving an individual defendant under Conn. Gen. Stat. § 52-57 or Fed. R. Civ. P. 4(e)(2).

Earlier in the case, Judge Nagala questioned whether "slipping the papers under the door" "is sufficient to effect service under state law." (Order, ECF No. 16.) Connecticut courts have long held that this method does suffice to effectuate service under Conn. Gen. Stat. §52-57, but only if the door under which the papers were slipped was indeed "the door to the defendants' usual place of abode." *Pozzi v. Harney*, 24 Conn. Supp. 488, 491 (1963) (collecting cases); *accord Fine Homebuilders,* 98 Conn. App. at 855-56. Here, the door under which North American's process server slipped the summons and complaint may not have been Mr. Pouncey's usual abode.

misrepresentation in the insurance application context, and the law surrounding life insurance incontestability clauses.

### 1.  *Default judgments*

When a defendant defaults, it "thereby admits all 'well-pleaded' factual allegations contained in the complaint." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (quoting *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004)).. And "[w]hen a defendant defaults in appearing or defending, a court may grant declaratory relief among other remedies." *Conn. Gen. Life Ins. Co. v. Ogbebor*, No. 3:21-cv-954 (JAM), 2022 WL 4077988, at *4 (D. Conn. Sept. 6, 2022) (citing *Am. Eur. Ins. Co. v. Tirado Iron Works & Fence, Inc.*, No. 19-cv-6851 (EK) (RLM), 2021 WL 7830143, at *4 (E.D.N.Y. Oct. 20, 2021)).

These principles do not mean, however, that courts should skip over all questions of liability in deciding motions for default judgments. As Judge Haight has observed, "[b]ecause default is only an admission of well-pleaded allegations, it 'is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover.'" *Trs. of the I.B.E.W. v. Norland Elec., Inc.*, No. 3:11-cv-709 (CSH), 2015 U.S. Dist. LEXIS 193752, at *5 (D. Conn. Feb. 19, 2015) (quoting *Evanauskas v. Strumpf*, No. 3:00-cv-1106 (JCH), 2001 WL 777477, at *1 (D. Conn. June 27, 2001)). "Therefore, before judgment can be entered, the court must determine whether plaintiff's factual allegations are sufficient to state a claim for relief on each of the causes of action for which the plaintiff seeks judgment by default." *Evanauskas*, 2001 WL 777477, at *1 (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)). In other words, "[w]hile a default constitutes an admission of all the facts 'well pleaded' in the complaint, it does not admit any conclusions of law alleged therein, nor establish the legal sufficiency of any cause of action."

*In re Indus. Diamonds Antitrust Litig.*, 119 F. Supp. 2d 418, 420 (S.D.N.Y. 2000) (citing 10A Charles Alan Wright et al., Federal Practice and Procedure, Civil § 2688, at 63 (3d ed. 1988)); *accord Trs. of the I.B.E.W.*, 2015 U.S. Dist. LEXIS 193752, at *5-6 (collecting cases).

In deciding whether to enter a default judgment, courts do not ordinarily consider non-jurisdictional affirmative defenses that might have been available to the defaulting defendant. "Generally, courts should not raise *sua sponte* nonjurisdictional defenses not raised by the parties." *Acosta v. Artuz*, 221 F.3d 117, 122 (2d Cir. 2000) (citing *Hardiman v. Reynolds*, 971 F.2d 500, 502 (10th Cir. 1992)).  A statute of limitations defense, for example, "is an affirmative defense under Fed. R. Civ. P. 8(c) that must be asserted in a party's responsive pleading 'at the earliest possible moment' and is a personal defense that is waived if not promptly pleaded." *Davis v. Bryan*, 810 F.2d 42, 45 (2d Cir. 1987) (quoting *Santos v. Dist. Council*, 619 F.2d 963, 967 n.5 (2d Cir. 1980)).  "If a defendant fails to assert the statute of limitations defense, the district court ordinarily should not raise it *sua sponte.*" *Id.* (citing, *inter alia*, *Concession Consultants, Inc. v. Mirisch*, 355 F.2d 369, 371 (2d Cir. 1966)).

There is, however, "no absolute bar" to *sua sponte* consideration of an affirmative defense. *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993).  Indeed, courts frequently do consider unpled, non-jurisdictional affirmative defenses in two circumstances.  The first is when the basis for the defense is "set forth in the papers plaintiff himself submitted." *Walters*, 651 F.3d at 293 (quoting *Leonhard*, 633 F.2d at 609 n.11).  The second is "where a doctrine implicates values that may transcend the concerns of the parties to an action." *Acosta*, 221 F.3d at 122 (quoting *Femia v. United States*, 47 F.3d 519, 523 (2d Cir. 1995)) (quotation marks and ellipses omitted).  At all times, district courts should remember that "a default judgment is an extreme remedy that should only be granted as a last resort." *Harper v. Kensington Family Auto Ctr., LLC*, No. 3:23-cv-1250

27

(SVN) (MEG), 2024 WL 3342307, at *5 (D. Conn. June 10, 2024) (quoting *Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 186 (E.D.N.Y. 2009), *report and recommendation approved and adopted*, slip op. (D. Conn. Aug. 14, 2024).

### 2. *Choice of law*

When a plaintiff sues in federal court and invokes diversity jurisdiction, the court "must apply the choice-of-law rules of the state in which that court sits[.]" *Liberty Synergistics, Inc. v. Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013). In insurance cases, Connecticut's choice-of-law rules provide that "the law of the state with the most significant relationship to the transaction and parties ought to be applied absent a choice of law provision in the insurance contract. In the absence of extraordinary circumstances, the law of the state where the principal insured risk is located will apply." *Farm Family Cas. Ins. Co. v. Samperi*, 242 F. Supp. 3d 83, 87 (D. Conn. 2017) (internal quotation marks omitted) (citing *Reichhold Chems., Inc. v. Hartford Accident & Indem. Co.*, 252 Conn. 774, 781 n.4, 782 (2000)). Because the "risk" in a life insurance case is the life of the insured, courts in the District of Connecticut apply "the local law of the state where the insured was domiciled at the time the policy was applied for." *Vasily v. MONY Life Ins. Co. of Am.*, 104 F. Supp. 3d 207, 213 (D. Conn. 2015) (internal quotation marks omitted) (quoting *Bush v. MONY Life Ins. Co. of Am.*, No. 3:07-cv-451 (WWE), 2008 WL 4874137, at *4 (D. Conn. Nov. 10, 2008). In this case, there is no choice of law provision in the policy (*see generally* Policy, ECF No. 1-2), and although there are questions about Mr. Pouncey's domicile at the time North American attempted to serve him with the complaint (*see* discussion, Section III.B *supra*), there is nothing suggesting that he was not domiciled in Connecticut at the time of his application. Connecticut law therefore applies to the contractual issues raised by North American's motion.

### 3.      *Misrepresentations in life insurance applications*

An insurance policy is ordinarily invalid when the policyholder obtains it by knowingly making a false statement of material fact.  As the Connecticut Supreme Court explained nearly a century ago, "[m]aterial representations . . . relied on by the company, which were untrue and known by the assured to be untrue when made, invalidate the policy. . . ."  *State Bank & Trust Co. v. Conn. Gen. Life Ins. Co.*, 109 Conn. 67, 72 (1929).  The Second Circuit has distilled the venerable rule of *State Bank and Trust* into a three-part test.  *See Pinette v. Assur. Co. of Am.*, 52 F.3d 407, 409 (2d Cir. 2005).  Under that test, an insurance policy may be voided when the insurer demonstrates "(1) a misrepresentation (or untrue statement) by the [applicant] which was (2) knowingly made and (3) material to the [insurer]'s decision whether to insure."  *Id.*

The first element is self-evidently satisfied when the applicant makes an untrue statement, *id.*, but the second element merits further discussion.  On the one hand, "'[i]nnocent' misrepresentations – those made because of ignorance, mistake, or negligence – are not sufficient grounds for rescission."  *Id.* at 409-10.  "However, a misrepresentation is not innocent where the insured failed to read the application before signing it, or failed to 'use reasonable diligence to see that the answers are correct[.]'"  *Provident Life & Accident Ins. Co. v. McKinney*, No. 3:19-cv-1325 (SVN), 2022 WL 4120768, at *4 (D. Conn. Sept. 9, 2022) (citing *Pinette*, and quoting *Corn v. Protective Life Ins. Co.*, No. 3:95-cv-556 (WWE), 1998 WL 51783, at *5 (D. Conn. Feb. 4, 1998)).  "[A]n insurer may obtain rescission of the insurance policy if the insured *unreasonably* believed that his answer was true."  *Id.* (citing, *inter alia*, *Middlesex Mut. Assur. Co. v. Walsh*, 218 Conn. 681, 698 (1991)).

The third element of the *Pinette* test is satisfied when the misrepresentation was material to the insurer's decision to issue the policy.  "Under Connecticut law, a misrepresentation is

material 'when, in the judgment of reasonably careful and intelligent persons, it would so increase the degree or character of the risk of the insurance as to substantially influence its issuance, or substantially affect the rate of premium.'" *Pinette*, 52 F.3d at 411 (quoting *Davis Scofield Co. v. Agricultural Ins. Co.*, 109 Conn. 673, 678 (1929)).  Moreover, since insurance companies do not typically ask application questions unless the answer would affect their decision on whether to issue the policy, false answers to application questions are almost always material.  *Id.* ("Connecticut caselaw strongly suggests that an answer to a question on an insurance application is presumptively material.").  In cases where the insurer "specifically requested" a truthful answer to a particular question, a false response "supports [a] . . . finding of materiality." *Id.*  And in the few instances in which courts have looked past a presumption and examined whether the misrepresentation was in fact material, they have not hesitated to grant rescission when the company states without contradiction that the false statement materially affected its policy issuance or premium decisions. *E.g., Ranger Ins. Co. v. Kovach*, 63 F. Supp. 2d 174, 186 (D. Conn. 1999) (holding that, because underwriter had testified by affidavit that "the premium . . . would have been significantly higher, if insurance had been offered at all," the "uncontradicted evidence supports the [insurer's] assertion that [the applicant's] representation was material").

In this case, North American's well-pleaded factual allegations establish that Mr. Pouncey made material representations in his life insurance application.  To begin with, he made at least two untrue statements, thereby satisfying the first element of the *Pinette* test.  He represented that he had "not been diagnosed or treated by a medical professional for . . . alcohol abuse" in the previous ten years (Application, ECF No. 1-1, at 4), but North American later learned in its contestability investigation that he had been diagnosed with alcohol use disorder in 2019. (Compl., ECF No. 1, ¶ 21.)  He also represented that he had not used cocaine in the previous ten years

(Application, ECF No. 1-1, at 3), but his medical records revealed that he had used cocaine less than a year before.  (Compl., ECF No. 1, ¶ 19.)

Mr. Pouncey's untrue statements also satisfy the second *Pinette* element.  As noted above, that element is satisfied when the applicant either knows his answers to be untrue, or unreasonably believes them to be true.  *Provident Life*, 2022 WL 4120768, at *4.  In this case, North American has alleged that Mr. Pouncey "knew, or should have known, of the falsity of" the untrue statements in his application (Compl., ECF No. 1, ¶¶ 27, 28) – an allegation that is deemed admitted for purposes of a default judgment motion.  *City of New York*, 645 F.3d at 137.  Moreover, even if Mr. Pouncey had appeared and claimed not to know that his statements were untrue, that lack of knowledge could not be considered reasonable.  While insurance applicants can sometimes have "some ailment or indisposition of so slight and temporary a character as to have left no impress upon his memory, in which event he could honestly answer in the negative an inquiry if he had been ill," *State Bank & Tr. Co.*, 109 Conn. at 71, courts have not regarded significant courses of medical treatment as "slight and temporary."  *E.g., Provident Life*,  2022 WL 4120768, at *7 (holding that an applicant's lack of knowledge of the falsity of his representations was unreasonable when, *inter alia*, his symptoms and treatment were "well documented in his medical records"); *cf. also Mt. Airy Ins. Co. v. Millstein*, 928 F. Supp. 171, 176 (D. Conn. 1996) (rejecting applicant's claim that his misrepresentations were not knowing because he was in a "fog" due to alcohol addiction at the time they were made, because he still "should have known that his answer was false").

Finally, North American's well-pleaded factual allegations establish the third *Pinette* element of materiality.  The company states that, "[h]ad Mr. Pouncey accurately disclosed his cocaine use and diagnoses and treatments for alcohol abuse, the Policy would not have been issued

31

and the Application would have been denied." (Compl., ECF No. 1, ¶ 30.) Furthermore, the misrepresentations were made in response to application questions and, therefore, were presumptively material. *E.g., Provident Life*, 2022 WL 4120768, at *8 (citing, *inter alia*, *State Bank & Tr. Co.*, 109 Conn. at 71). Because Mr. Pouncey made untrue statements that, at a minimum, he could not reasonably have thought true – and because those untrue statements were material to the decision to issue the policy – North American would ordinarily be entitled to rescission. *Pinette*, 52 F.3d at 409.

### 4. *Incontestability*

In the life insurance context, however, there is an important limitation on the insurer's right of rescission: the incontestability clause. An incontestability clause is "[a]n insurance-policy provision . . . that prevents the insurer, after a specified period . . . from disputing the policy's validity on the basis of fraud or mistake." *Incontestability Clause*, BLACK'S LAW DICTIONARY (8th ed. 2004). Incontestability clauses "fix a time within which the insurer must ascertain the truth or falsity of representations and contest the validity of the policy," and they render "[a] contest of a policy . . . too late if it is commenced after the expiration of the contestable period." *United Cent. Life Ins. Co. v. Marshall*, No. FST-cv-14-6023033, 2015 WL 6558198, at *3 (Conn. Super. Ct. Oct. 5, 2015) (quoting 17 L. Russ & T. Segalla, Couch on Insurance § 240.3, pp. 240-10 through 240-11 (3d ed. 2005)). As noted above, the policy at issue in this case contains an incontestability clause that begins: "The Company cannot contest this Policy after it has been in effect during the lifetime of the Insured for two years from the Policy Date or, if reinstated, for two years from the date of reinstatement[.]" (Policy, ECF No. 1-2, at § 3.3, p. 7.)

Incontestability clauses serve important purposes, and they benefit all the players in the life insurance relationship. On the one hand, these clauses protect insureds and beneficiaries against

opportunistic behavior by the insurer.  Without an incontestability clause, an insurer could learn of a material misrepresentation shortly after issuing the policy; lay in the weeds and collect premium for decades; and then deny a claim on grounds that, because of the lapse of time and the death of the insured, the beneficiaries would be ill-positioned to oppose.  *See Amex Life Assur. Co. v. Super. Ct.*, 930 P.2d 1264, 1267 (Cal. 1997) (observing that an incontestability clause "prevents an insurer from lulling the insured, by inaction into fancied security during the time when the facts could best be ascertained and proved, only to litigate them belatedly, possibly after the death of the insured" (citation and quotation marks omitted)).  Innocent beneficiaries can come to rely upon a life insurance policy even when it was obtained by misrepresentation, and by limiting the company's period for investigating and challenging the insured's application, incontestability clauses balance the insurer's right to rescind against those reliance interests.  *See Northwestern Mut. Life Ins. Co. v. Johnson*, 254 U.S. 96, 101-02 (1920) (Holmes, J.) (observing that "the object of [an incontestability] clause is plain and laudable – to create an absolute assurance of the benefit, as free as may be from any dispute of fact except the fact of death, and as soon as it reasonably can be done").

On the other hand, incontestability clauses benefit insurers as well.  As the California Supreme Court has explained, "[i]ncontestability clauses have been used by the insurance industry for over one hundred years to encourage persons to purchase life insurance."  *Amex Life Assur. Co.*, 930 P.2d at 1236 (quotation marks and citation omitted).  These clauses disarm "public distrust of insurers and their promises to pay benefits in the future" and, in so doing, make it easier to market insurance.  *Id.* (quotation marks and citation omitted).  They also make life insurance underwriting less expensive.  By allowing the insurer a reasonable time to investigate the insured's representations after policy inception, an incontestability clause saves the company from having

to conduct an expensive investigation every time someone applies for coverage.  The insurer can reserve its most expensive investigatory steps for those applicants who accept the offer of insurance and pay the initial premium.

Because incontestability clauses serve important purposes, courts carefully enforce them. As Judge Thompson has observed in the disability insurance context, "[i]ncontestability clauses 'are enforced with particularly by the courts because of the desirable purpose which they have.'" *Lane v. Jefferson Pilot Fin. Ins. Co.*, No. 3:02cv-1038 (AWT), 2006 U.S. Dist. LEXIS 61643, at *2 (D. Conn. Aug. 30, 2006) (quoting 1A John A. Appleman & Jean Appleman, *Insurance Law & Practice* 311 (1981)).  Judge Nevas likewise noted in the same context that incontestability clauses are exactingly enforced because "they are designed 'to put a checkmate on litigation; to prevent, after the lapse of a certain period of time, an expensive report to the courts – expensive both from the point of view of the litigants and that of the citizens of the state." *Minn. Mut. Life Ins. Co. v. Ricciardello*, No. 3:96-cv-2387 (AHN), 1997 U.S. Dist. LEXIS 15797, at *6 (D. Conn. Sept. 17, 1997) (quoting 1A John A. Appleman & Jean Appleman, *Insurance Law & Practice* 311 (1981)).

Reflecting this careful enforcement, Connecticut courts have held that to raise an effective "contest" within a contestability period, an insurer must commence a suit against the insured.  In *Rigas*, for example, the Connecticut Supreme Court held that simply mailing a letter to the insured "repudiat[ing] liability on the policy" and returning the premiums paid "*is not sufficient* to constitute a contest of the policy" for purposes of an incontestability clause.  117 Conn. at 438, 444 (emphasis added).  If it wishes to stop the running of the contestability period, the insurer instead "must proceed within the time limited, either by way of defense to an action on the policy, or by an affirmative suit to cancel it." *Id.* at 444 (citing, *inter alia*, *Killian v. Metro. Life Ins. Co.*,

34

251 N.Y. 44 (1929)).   And in *PHL Variable Insurance Co.*, Judge Robaina agreed that, "to effectively 'contest' a policy . . . an insurer must properly commence an action challenging its validity."   2012 WL 2044416, at *3 (citations omitted).   While at least one sister state permits insurers to raise contests merely by providing the insured with written notice of rescission and return of any premiums paid, *Stiegler v. Eureka Life Ins. Co. of Baltimore*, 127 A. 397, 402 (Md. 1925), no Connecticut court has agreed with that view.

North American does not dispute this point.   *Rigas* was governed by New York law, 117 Conn. at 444, and *PHL Variable Insurance Co.* is a non-binding Superior Court case, so there may arguably have been some room for North American to contend for the minority view expressed in *Stiegler*.   But *Rigas* and *PHL Variable Insurance Co.* are both fully consistent with the overwhelming majority view across the country.   8 Jeffrey E. Thomas, *New Appleman on Insurance Law Library Ed.* § 83.09[3] (2023) ("The vast majority of jurisdictions define 'contest' to mean some affirmative or defensive action taken in court to cancel the policy or prevent its enforcement.   In other words, litigation is required." (footnote omitted)).   Presumably for this reason, North American does not dispute that it was obliged to commence suit against Mr. Pouncey by February 5, 2023 if it wanted to stop the policy from becoming incontestable.[2]   (*See generally*

---

[2]       Moreover, North American would not have demonstrated an entitlement to rescission even if *Stiegler's* minority rule applied.   Under that rule, the insurer must not only provide the insured with written notice of rescission; it must also offer to return all premiums paid.   *Stiegler*, 127 A. at 402 (holding that, because the "injured party may not require the return of what has been obtained from him by deceit until he has in turn restored, or offered to restore, to the limit of possibility, what of value was received by him from the wrongdoer," "[t]he failure of the insurance carrier to return, or offer to return, the premiums received prior to the asserted election to rescind is evident of its conclusion to continue the contract, and, as a general rule, will justify the court in holding, as a matter of law, that the carrier has not proved its election to terminate").   In this case, the record contains no evidence of any attempt to return the premium (*see* Compl., ECF No. 1, ¶ 23) (stating only that North American provided notice of its desire to rescind in a January 5, 2023 letter to Mr. Pouncey, but saying nothing about the return of premiums paid), even though North American has returned the premium in other cases.   *E.g., N. Am. Co. for Life & Health Ins. v.*

Resp. to Show Cause Order, ECF No. 30; Tr. of Hrg. on Mot. for Default J., ECF No. 35; Suppl. Br., ECF No. 36.)

Furthermore, North American was obliged to *serve* its complaint – not just file it – before the expiration of the contestability period.  Under Connecticut state law, an action is commenced when it is served on the defendant, not when it is filed with the court.  *E.g. Seaboard Burner Corp. v. DeLong*, 145 Conn. 300, 303 (1958) ("From a very early date in this state the time when the action is regarded as having been brought is the date of service of the writ upon the defendant." (citation omitted)); *accord Lacasse v. Burns*, 214 Conn. 464, 475 (1990) (reaffirming that "the time when the action is regarded as having been brought is the date of service" (emphasis omitted)).  And notwithstanding Fed. R. Civ. P. 3, this rule applies in federal court when jurisdiction is based on diversity of citizenship.  *South v. Saab Cars USA, Inc.*, 28 F.3d 9, 12 & n.2 (2d Cir. 1994) (noting that, although "the *filing* of the complaint commences civil actions" under Rule 3, "[t]his rule does not apply when jurisdiction is based on diversity of citizenship, in which case state law governs the effective date of commencement for limitations purposes"); *see also Cocco v. Preferred Mut. Ins. Co.*, 637 F. Supp. 94, 95-97 (D. Conn. 1986) (dismissing insurance case in which complaint was filed in federal court, but not served, within a limitation period).  North American has not disputed this point either.  (*See generally* Resp. to Show Cause Order, ECF No. 30; Tr. of Hrg. on Mot. for Default J., ECF No. 35; Suppl. Br., ECF No. 36.)

To recap, then, North American does not dispute that it had to commence a lawsuit against Mr. Pouncey by February 5, 2023 to stop its policy from becoming incontestable.  It also does not dispute that it had to serve the lawsuit on him by that date, and it does not claim to have done so.

---

*Hines*, No. 4:20-cv-195 (FL), 2021 WL 2306265, at *2 (E.D.N.C. May 6, 2021) (stating that North American "tendered a check in the amount of $1,577.97 to defendant, as the designated beneficiary of the Policy, which represents a full and complete refund of the premium paid").

(*See generally* Resp. to Show Cause Order, ECF No. 30; Tr. of Hrg. on Mot. for Default J., ECF No. 35; Suppl. Br. to the Court's Order to Show Cause, ECF No. 36.)  Instead, North American urges the Court to grant its motion notwithstanding the contestability issue, for three principal reasons.  I find each of the three unpersuasive.  Because the third argument would seem to precede the others analytically, I will address them in a different order than North American did in its supplemental brief.

a.      Incontestability as an affirmative defense

First, North American contends that incontestability is an affirmative defense that the Court should not consider on a motion for default judgment.  (Resp. to Order to Show Cause, ECF No. 30, at 2.)  It acknowledges that "no Connecticut caselaw directly addresses whether incontestability is an affirmative defense that must be asserted by the insured[,]" or whether instead the continued contestability of the policy "must be pleaded and proven by the insurer[.]"  (Suppl. Br., ECF No. 36, at 5.)  It notes, however, that in Connecticut "an incontestability period is a contractual limitation" rather than a statutory one,[3] and that "[c]ontractual limitations have been deemed to be affirmative defenses."  (*Id.*) (citing, *inter alia*, *405 Sullivan Ave. Indus. LLC v. Kuhns Family Props., LLC*, No. 3:23-cv-240 (SVN), 2023 WL 4491745, at *3 (D. Conn. July 12, 2023)).  It therefore argues that "Mr. Pouncey had the obligation to raise [incontestability] as an affirmative

---

[3]      Connecticut law requires life insurance policies to include an incontestability provision in some contexts.  *See, e.g.,* Conn. Gen. Stat. §38a-639(9) (requiring incontestability clause in life insurance certificates issued by fraternal benefit societies); Conn. Agencies Regs. § 38a-433-4(c)(14) (requiring incontestability clause in variable life insurance contracts).  But an incontestability clause is not required in a simple term life policy like the one at issue here.  *See PHL Variable Ins. Co.*, 2012 WL 2044416, at *5 (observing that, "unlike many states, Connecticut does not require individual life insurance policies to contain an incontestability clause by either statute or regulation" (quotation marks, alterations, and citation omitted)).

defense if he contested the relief sought," and that he "should not be rewarded for failing to litigate his rights." (*Id.*)

Yet even if incontestability is an affirmative defense, that does not mean that the Court cannot and should not consider it. To be sure, the Second Circuit has said that district courts should ordinarily refrain from raising non-jurisdictional affirmative defenses *sua sponte. Davis*, 810 F.2d at 44. And North American is right when it says that ours "is an adversarial system, not an inquisitorial one." (Resp. to Show Cause Order, ECF No. 30 at 2) (citing *United States v. Burke*, 504 U.S. 229 (1992)). But district courts can and often do consider unpled affirmative defenses in two situations – first, when the basis for the defense is "set forth in the papers plaintiff himself submitted," *Walters*, 651 F.3d at 293, and second, "where a doctrine implicates values that may transcend the concerns of the parties to an action." *Acosta*, 221 F.3d at 122.

In this case, the basis for an incontestability defense is plainly "set forth in the papers plaintiff [it]self submitted." North American placed the Policy into the record, and that Policy clearly states that the company cannot contest it once it has been in effect "for two years from the Policy Date." (Policy, ECF No. 1-2, §3.3, p. 7.) Moreover, North American's own service return confirms that it did not commence its contest until the Policy had been incontestable for almost seven months, if indeed service was properly made. (Proof of Service, ECF No. 18.) Under these circumstances, it is entirely appropriate for the Court to raise the contestability issue *sua sponte. See, e.g., DeSantis v. City of New York*, No. 10-Civ.-3508 (JPO) (GWG), 2013 WL 3388455, at *5 (S.D.N.Y. July 8, 2013) (observing that "consideration of [a timing] defense is appropriate in the instance case because the commencement of this action was well outside the applicable limitations period") (quotation marks, citation, and ellipsis omitted), *report and recommendation approved and adopted*, 2014 WL 228659 (S.D.N.Y. Jan. 22, 2014).

North American argues that district courts should consider non-jurisdictional affirmative defenses raised by the plaintiff's own papers only when "the defendants made some effort to participate in the matter in some form and made their positions known" (Suppl. Br., ECF No. 36, at 6), but the case law in the Second Circuit does not support this limitation. In *DeSantis,* for example, the defendant did not appear at all, yet the court still denied the plaintiff's default judgment motion on statute of limitation grounds. 2013 WL 3388455, at *2, 7, 8. Similarly, in *Graham v. HSBC Mortgage Corporation*, the district court denied the plaintiffs' motion for default judgment and dismissed their claims on statute of limitation grounds, even though the defendants had not appeared and made their position known. No. 18-cv-4196 (KMK), 2022 WL 1266209, at *2, 6-7 (S.D.N.Y. Apr. 28, 2022). And in cases too numerous to list, district courts have considered non-jurisdictional timing defenses when reviewing *pro se* prisoner complaints under 28 U.S.C. § 1915 – even though the defendant had not even been served, let alone appeared and "made some effort to participate." *E.g., Lenti v. Quiros*, No. 3:24-cv-1083 (JAM), 2024 WL 3400529, at *2 (D. Conn. July 12, 2024) (holding, in a case in which the defendant had yet to be served, that "the statute of limitations bars [the plaintiff's] action" in part).

The second reason for considering an unpled affirmative defense – that the defense "implicates values that may transcend the concerns of the parties to the action" – also applies here. North American correctly notes that this principle is typically invoked "in criminal and habeas corpus cases and cases that otherwise involve government actions or federal law," and it is right when it says that there is little if any authority applying it "to private matter [*sic*] of contract." (Suppl. Br., ECF No. 36, at 7.) But it is wrong when it suggests that its motion implicates nobody's interests other than its own and Mr. Pouncey's. The judgment it seeks would deprive the beneficiary of insurance protection on which she may be relying.

Finally, North American makes an essentially equitable argument for bypassing the contestability issue.  It asserts that Mr. Pouncey made "active attempts to avoid service in this matter," and it adds that if the Court were to consider an affirmative defense that he did not plead, it would be "reward[ing him] for failing to litigate his rights." (Suppl. Br., ECF No. 36, at 5.)  The company also professes concern about the effect that a denial of its motion would have on other cases, arguing that "[i]f the Court were to decide this issue *sua sponte*, it would permit insureds to merely ignore requests to rescind policies and use avoidance of service of process to benefit themselves." (Resp. to Show Cause Order, ECF No. 30, at 2.)  It adds that "[t]his cannot be correct because it is an upheaval of an insurer's ability to rescind a contract on the basis of material misrepresentations or fraud." (*Id.*)

This argument is also unpersuasive, because the equities do not clearly favor North American on the current record.  On the one hand, there is no evidence for the claim that Mr. Pouncey actively dodged the company's efforts to rescind the policy without litigation.  The only evidence in the record about those efforts is a two-sentence statement in the complaint, in which North American alleged that it had sent Mr. Pouncey a letter "explaining that it would like to rescind the Policy" and "request[ing] his mutual agreement to do so," and that he "did not respond." (Compl., ECF No. 1, ¶¶ 23, 24.)  These allegations do not describe "active attempts" to avoid engaging with the company, particularly given the likelihood that the letter was sent to an obsolete address.  (*Cf.* Aff. of Non-Service, ECF No. 10-2) (indicating that the address in North American's files as of February 13, 2023 was for an apartment that had been occupied by new tenants).  Furthermore, there is little if any evidence for the claim that Mr. Pouncey actively dodged service of the summons and complaint.  This appears to be an inference that North American drew from the fact that Kandi Jackson's call came "from a number known to be associated with

Defendant Pouncey's former spouse and her business" (ECF No. 10, ¶ 5), but it is equally plausible that Mr. Pouncey simply does not live at the East Hartford address anymore, if indeed he ever did. After all, North American's process servers went to that address on ten different occasions at different times of day, and never once found him or his car there.  (ECF Nos. 12-1, at 5 (three occasions); 15-1, at 5 (six occasions); 18 (one occasion).)

On the other hand, North American was not diligent about ascertaining or asserting its rights.  It had two full years to investigate Mr. Pouncey's application representations, but the record contains no reason to suppose that it did so promptly – or that it did anything other than wait until the very end of the contestability period before even beginning its investigation.[4]  While the company contends that this is a dispute between an uncooperative insured and an insurer that "did what it was supposed to do every step of the way" (Resp. to Show Cause Order, ECF No. 30, at 1), the record is equally susceptible to the view that Mr. Pouncey may not have received the pre-litigation rescission letter because the company did not conduct a prompt contestability investigation and let his address go stale in the meantime.  In short, to the extent that the Court considers the equities of the situation, they do not clearly favor North American on the current record.

b.      Incontestability and policies alleged to be void *ab initio*

North American next contends that incontestability defenses do not apply when the insurer asserts that the policy is void *ab initio*.  (Suppl. Br., ECF No. 36, at 4-5.)  It cites *PHL Variable*

---

[4]      At oral argument, the Court asked North American's counsel when the company began its contestability investigation.  (Tr. of Hrg. on Mot. for Default J., ECF No. 35, at 7:6-16.)  Counsel stated that she did "not believe that the insurance company waited until the end of the period," but conceded that she did "not have those specifics at the moment."  (*Id.* at 7:17-21.)  North American provided no further information on this issue in its supplemental brief.  (*See generally* Suppl. Br., ECF No. 36.)

*Insurance Co.*, a so-called "stranger-owned life insurance" case in which the insurer alleged that the policy was void *ab initio* for lack of an insurable interest.[5]  2012 WL 2044416, at *1.  In that case, the court observed "a strong public policy in Connecticut against the enforcement of contracts that lack an insurable interest."  *Id.* at *6.  It therefore held that such contracts are void *ab initio* – and because they are, the putative insured could not avoid rescission by appealing to "a provision, such as an incontestability clause, in the unenforceable contract."  *Id.*  North American urges the Court to apply these principles to this case, in which the basis for claiming that the policy is void *ab initio* is not a lack of insurable interest.  (Suppl. Br., ECF No. 36, at 4-5.)  In the operative complaint, the company instead seeks to have its policy declared void on account of a knowing but non-fraudulent application misrepresentation.[6]  (Compl., ECF No. 1, ¶27.)

No Connecticut court has ever done what North American urges this Court to do, and for good reason.  Stranger-owned life insurance cases present entirely different public policy considerations than cases of simple, non-fraudulent misrepresentation.  More fundamentally, the entire purpose of an incontestability clause is to "give[] the insurer a fixed period of time to ascertain the truth of representations made by the applicant and to take any necessary action to protect its rights," *Minn. Mut. Life Ins. Co.*, 1997 WL 631027, at *2, and if an insurer could elude

---

[5]     An "insurable interest" is a "legal interest in another person's life or health or in the protection of property from injury, loss, destruction, or pecuniary damage."  *Insurable Interest*, BLACK'S LAW DICTIONARY, (8th ed. 2004).  "To take out an insurance policy, the purchaser or the potential insured's beneficiary must have an insurable interest.  If a policy does not have an insurable interest as its basis, it will [usually] be considered a form of wagering and thus be held unenforceable."  *Id.*; *see also Fuller v. Metro Life Ins. Co.*, 41 A. 4, 15 (Conn. 1898) (observing that life insurance "may be purchased by one on his own account where he may suffer damage from another's death by reason of kinship, the relation of creditor, or other insurable interest[,]" but "when this element of protection is entirely eliminated, the insurance is a wager, and the contract is void").

[6]     North American contends that it can, consistent with Rule 11, amend its complaint to allege that Mr. Pouncey's misrepresentations were fraudulent.  (*See* Suppl. Br., ECF No. 36, at 1-4.)  That contention will be addressed separately in Section III.C.4.c *infra*.

its own incontestability clause merely by asking for a declaration that the policy is void rather than voidable on account of a non-fraudulent misrepresentation, the essential purpose of the clause would be subverted.  It is therefore unsurprising that courts routinely enforce incontestability provisions even when the insurer seeks to have the policy voided and rescinded on account of a misrepresentation.  *E.g., id.* at *2-3; *see also Thal v. Berkshire Life Ins. Co.*, No. 3:98-cv-11 (AHN), 1999 WL 200697, at *3 (D. Conn. Mar. 24, 1999).

c.     Incontestability and fraud

Finally, North American argues that if the Court holds that its misrepresentation claim is barred by the Policy's incontestability clause, it should be given leave to amend its complaint to allege fraud.  (Suppl. Br., ECF No. 36, at 1-4.)  The company's particular form of incontestability clause permits challenges after the contestability period in cases of fraud, but only "when permitted by applicable law in the state where this Policy is delivered or issued for delivery."  (Policy, ECF No. 1-2, § 3.3, p. 7.)  North American asserts that "Connecticut law does not preclude a fraud exception to incontestability."  (Suppl. Br., ECF No. 36, at 1.)

A few states recognize such an exception.  The New Jersey Supreme Court, for example, has held that "[e]ven after the expiration of the contestability period, an insurer may deny a claim if the insured committed fraud in the policy application."  *Ledley v. Wm. Penn Life Ins. Co.*, 138 N.J. 627, 635 (1995) (citing *Paul Revere Life Ins. Co. v. Haas*, 137 N.J. 190 (1994)).  A handful of state legislatures have incorporated fraud exceptions into statutes requiring incontestability clauses in individual life policies.  *Sun Life Assur. Co. of Canada v. Berck*, 770 F. Supp. 2d 728, 732 n.4 (D. Del. 2011) (listing statutes).

Yet this exception has never been recognized in Connecticut – and indeed, the available authorities are to the contrary.  In *United Life*, for example, Judge Lee acknowledged the general

rule that "[f]raud vitiates all contracts, written or otherwise."  2015 WL 6558198, at *3 (quoting *Harold Cohn & Co. v. Harco Int'l, LLC*, 72 Conn. App. 43, 49 (2002)).  But he added that, "[w]here there is an incontestability clause associated with a contract for insurance . . . claims for fraud may be precluded."  *Id.*  This is so because "[i]ncontestable provisions recognize all the defenses available to the insurer but prescribe a time beyond which they may not be asserted."  *Id.* (quoting 17 L. Russ & T. Segalla, Couch on Insurance § 240.3, pp. 240-10 through 240-11 (3d ed. 2005)).  In *Anastasion v. Metropolitan Life Insurance Co.*, the court stated that "[t]he purpose and effect of the incontestability clause is simply that after the lapse of two years from the date of the policy, the insurer is precluded from canceling the policy on the ground that it is voidable *because of fraud in its procurement* . . . ."  5 Conn. Supp. 157, 158 (Conn. Super. Ct. 1937) (emphasis added).  Judge Robaina agreed with this statement in *PHL Variable Insurance Co.*, 2012 WL 2044416, at *2.

The Connecticut federal courts have not recognized this exception either.  In *Thal*, for example, the court observed that if a disability insurer "fails to investigate an insured's application for insurance, it waives its right to contest the policy even where there is fraud."  1999 WL 200697, at *2.  And in *Minnesota Mutual Life Insurance Co.*, the court likewise stated that "[o]nce the contestable period is over the insurer may not contest coverage, even if the insured committed fraud in applying for the policy."  1997 WL 631027, at *2.  The court explained that an incontestability clause "is not a stipulation absolutely to waive all defenses and to condone fraud." *Id.* (quoting *Amex Life Assur. Co. v. Slome Capital*, 930 P.2d 1264, 1267 (Cal. 1997)).  "On the contrary, it recognizes fraud and all other defenses but it provides ample time and opportunity within which they may be, but beyond which they may not be, established."  *Id.* (quoting *Amex*

*Life Assur. Co.*, 930 P.2d at 1267)).  In short, at least five Connecticut state and federal cases have rejected North American's proffered exception, and no Connecticut case has adopted it.

North American points out that in each of these cases, the incontestability clause had different language.  (Suppl. Br., ECF No. 36, at 3.)  The company's policy excepts fraud contests from the incontestability provision "when permitted by applicable law in the state where this Policy is delivered or issued for delivery" (Policy, ECF No. 1-2, § 3.3, p. 7), and it correctly notes that the policies in the above-cited cases did not.  But this observation merely begs the question of whether post-contestability fraud challenges are indeed "permitted" by Connecticut law.

In addressing that question, the Court does not reflexively assume that Connecticut law permits what it has not expressly forbidden, as North American would have it.  Rather, "[w]hen the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." *Travelers Ins. Co. v. 633 Third Assoc.*, 14 F.3d 114, 119 (2d Cir. 1994), *Mumma*, 648 F. Supp. 3d at 391.  Following this rule, the Court can predict that the Connecticut Supreme Court would not permit a fraud challenge after the expiration of a contestability period, even under North American's language.  For nearly a hundred years, courts in this state have held that the purpose of an incontestability clause is to place a time limit on the insurer's ability to contest a policy on grounds of fraud, *e.g., Anastasion*, 5 Conn. Supp. 157, 158, and there is no reason to suppose that the Connecticut Supreme Court would see it differently in North American's case.  Moreover, Connecticut follows the rule that "any ambiguity in the language of an insurance policy is to be resolved against the insurer as the party that drafted the policy."  *Jemiola v. Hartford Cas. Ins. Co.*, 335 Conn. 117, 124 (2019).  Thus, any ambiguity about whether a late fraud contest is "permitted by applicable law" would have to be resolved in Mr. Pouncey's favor.

Finally, even if the Court did accept that Connecticut law is unsettled or inconsistent, the possibility of encroaching upon the domain of the state court would affect the analysis of whether the Court should exercise jurisdiction under the DJA. Imagine that the question of whether Connecticut law permits late fraud contests is more difficult than the preceding paragraph supposes. In that event, the *Admiral Insurance* factors would balance differently. As previously noted, the fourth factor – the degree to which the proposed declaratory judgment would create "friction between sovereign legal systems" or improper "encroach[ment] on the domain of a state court" – is analyzed differently when the case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case[.]" *Tilley*, 283 F. Supp. 2d at 738-39 (alterations, quotation marks, and citation omitted); *see also Mt. Vernon Fire Ins. Co. v. Linarte*, No. 3:09-cv-442 (VLB), 2010 WL 908939, at *4 (D. Conn. Mar. 8, 2010); *cf. Parrot v. Guardian Life Ins. Co. of Am.*, 338 F.3d 140, 144-45 (2d Cir. 2003) (certifying questions to the Connecticut Supreme Court, in recognition of the state courts' "strong interest in deciding the issues certified rather than having the only precedent on point be that of a federal court, which may be mistaken") (citations, brackets, and quotation marks omitted); *cf. also Fireman's Fund Ins. Co. v. T.D. Banknorth Ins. Agency, Inc.*, 644 F.3d 166, 172 (2d Cir. 2011) (noting the Connecticut courts' special expertise in insurance law). If, as North American contends, the question of whether Connecticut law permits late fraud challenges is not easily addressed by cases like *Anastasion*, *PHL Variable Insurance Co.* and *United Life*, then it can only be a "difficult" one that "transcends the result in [this] case," because it will affect insureds other than Mr. Pouncey. In summary, the question appears to be an easy one, and if it is not, this Court should decline to exercise jurisdiction over it.

**IV.    CONCLUSION**

For the foregoing reasons, I recommend that Judge Nagala **DENY** the motion of the Plaintiff, North American Company for Life and Health Insurance, for entry of a default judgment against the Defendant, Roberto Pouncey, without leave to replead.

This is a recommended ruling by a Magistrate Judge.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this recommended ruling must be filed with the Clerk of the Court within fourteen days of being served with this order.  Fed. R. Civ. P. 72(b)(2).  Failure to object within fourteen days "operates as a waiver of any further judicial review of the [Magistrate Judge's] decision[,]" including by the Court of Appeals.  *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Impala v. United States Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (holding that a failure to file a timely objection to a Magistrate Judge's recommended ruling precluded review by the Second Circuit); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6.

Entered at Hartford, Connecticut this 3rd day of September, 2024.


*/s/ Thomas O. Farrish*

Hon. Thomas O. Farrish
United States Magistrate Judge